I'm going to address the voir dire issue and the jury instruction issue from my briefs and then turn it over to co-counsel, I believe, to talk about the RICO submission. During jury selection, the district court was talking to the jury veneer about various legal principles and when it made some statements about the presumption of innocence and how suspicions the jurors have might play into that. It's on ER page 2 and what the district court said... It might be suspicious, but set that aside. Essentially. So what's wrong with that? What's wrong with that is that it didn't exactly say set the suspicions aside.  Also, at the end of the case, was to correctly identify the presumption, the burden of proof, the requirement that the government prove the case beyond a reasonable doubt. But it never stated anything to extinguish what it said about the suspicion. Can I ask you, this was like a 21 day trial. It was. My experience is that a jury couldn't pass a test on what was said during the process of jury selection by the end of the trial when they get the judge's charge. Aside from the fact that it's not so clearly, even accepting the premise of your argument, it's not so clearly wrong. There certainly was quite a... I mean, if he had said this maybe in the charge to the jury, it's another story. I think it kind of cuts both ways. This was not just a court taking off pattern instructions during jury selection. Well, it's really not your strongest argument because every criminal trial, it's pretty standard. I mean, I did a lot of criminal trials, and people are, they think, some people think if someone's been arrested, it means that they're guilty. And so you have to kind of explore that concept of tie it in to beyond a reasonable doubt. Which is what the Dilch case from the 11th Circuit talks about. There's nothing wrong, perhaps, with the district court saying to the jury veneer, you may be suspicious of these guys who are on trial. You may be suspicious or think there's a reason they've been charged. But then the court also needs to tell the jurors, set that aside. And that's what the Dilch case says. You cannot consider these suspicions. They must be set aside. And it's the second part of this that the district court didn't do in this case. And that's why I think this was essentially a non-formal statement to the veneer about suspicions they may feel. And never that second statement saying you can't feel those suspicions. Well, what he says is this, unless I have this wrong, and you can correct me. You may be suspicious regarding the defendants. You may think that something has occurred. You may think there's a reason why the government has charged them. The point is that the government, in the course of this trial, through evidence offered in this case, fails to prove their case. You must return a verdict of not guilty. That's exactly what the judge said. Yeah. So why do you think that the second part was missing? The second part was missing because it dealt with what you ultimately needed, what the government ultimately needed to prove to make its case, to obtain convictions. But it never talked about whether the ball is starting at the 20-yard line after a touchback or maybe it's starting at the 30. Was your client convicted of everything that he was charged with? No, he was not. So they kind of got it on something, didn't they? Well, it's hard to say. If they're really suspicious, wouldn't they just have, if we follow your theory, wouldn't they just have found them guilty if they were suspicious of everything? Well, I mean, it's hard to say what they were doing with each individual count. But going back to the point where the problem here isn't the end result, the end game. So what was your client acquitted of? He was acquitted of count 9, the 18 to the bedding, the 924C count. And there was a good finding as to count 5, the drug conspiracy. But we don't know if the jurors started the process at innocence or if they started the process with a suspicion. So were you the trial attorney? No, I was not. Okay. And I think that's a problem. And, again, even though the government talks a lot about all the proper instructions that were given as to the burden of proof and beyond a reasonable doubt, and the government has to prove its case, but the very first thing... You can talk about this as long as you want, but I think your Sears argument is your better argument. But if you want to talk about it, you can. Let's talk about Sears. All counsel requested a Sears instruction regarding the conspiracy count in this case. Which in the Sears instruction from the Fifth Circuit essentially says you can't conspire with a CI because the CI is attempting to frustrate the conspiracy. And we've adopted that as a model. That's correct. And the district court denied the Sears instruction in this case, basically finding that because there was evidence that Mr. White might have conspired with other people besides the CI, the Sears instruction was not warranted. And it's our position that that's not the correct analysis. Well, distinguish Montgomery then because in Montgomery we said we implicitly held that a Sears instruction is not required unless there is some evidence showing that the only, underscore only, possible conspiracy was between the defendant and the CI. Well, the evidence in this case, Your Honor, is that was Mr. White's defense. Well, there was a lot more evidence. The government would say there was... A boatload of evidence. Overwhelming evidence. Showing conspiracies with co-defendants or conspiracies with guys in the neighborhood or uncharged conspirators. But, Mr. Wasn't Montgomery a plain error? I believe it was. The discussion in that case was the application of the plain error rule, not where there was a timely request. Correct. And I think what we have here is if we look to the very generous test for when a defendant gets a jury instruction for a theory of defense, again, we have the component of the CI. He certainly was there. There were two sales to the CI that were on video. So, we have that component of it. And just because there might be additional evidence in the record showing a conspiracy with other people, I don't think undoes... Did you concede that issue? Did you concede that that was him in there and that it was just like... That was conceded during a closing argument. I didn't do it, but defense counsel conceded that the two small sales to the CI happened and he did those. But the argument was there was no drug conspiracy. There was no conspiracy with anyone else to do anything else. And so, when we talk about the generous standard for these jury instructions, I think he made that standard in this case. I think he made it easily because we had the CI interactions and then we had the overall argument, which was there was no other conspiracy. How does this... Let's assume we agreed with you. How does this affect... You argue that this requires the reversal of the conviction on count one, do you? Well, that's a tougher road to hoe, certainly. That's why I'm asking you about it. Well, I... I don't... That's a conspiracy to conduct the affairs of an enterprise pursuant to a pattern of racketeering. And then they have, I don't know, over 100 overt acts. And two of those overt acts only involve, I think it's 84 and 85, but involve the sales to the CI. Right. The RICO conspiracy count one is certainly different in elements and... Yeah. ...from count five. The problem I think we have is we have, based on the jury's verdict in this case, which was a finding of guilt on count five, but under 50 grams of heroin only, it looks like the jury might have convicted Mr. White of conspiring with the CI because that's what it found with respect to the quantity for count five. Well, it was easy. It was easy. They had the evidence right there. I mean, it's just like, okay, so... But he couldn't conspire with the CI. If the government argued multiple times during closing that there was so much evidence that everyone in the projects knew about all the drug dealing, they were all part of it, and everything was foreseeable. But when it came time for the verdict, the only verdict they returned in terms of quantity type for Mr. White was under 50 grams of heroin. So there's... If I were your co-counsel, I'd be getting a little nervous. How much time did you say you'd save for them? I was going to go to about 12 minutes or so. Yeah. Well, let me tie this off, though. Hypothetically, if we agree with you on the Sears instruction then, back to Judge Carman's question, what ramifications does that have in the verdict? What's your argument? Well, Count 5 needs to be reversed. And Count 1's a little tougher, but you would argue that... We have a jury, I think, with an unfair and unlawful understanding of what has to happen for a conspiracy. There certainly could be spillover after Count 1, even though the elements are different. It's another conspiracy. What do you suppose you're successful just on Count 5? What do you get that's meaningful? Not much. Okay. Not much. Because the judge gave concurrent sentences. Count 1 drove the sentence in this case. The pencil hold was 19 for Count 1. And Count 2 as well, isn't it? Count 5 was 16. So, yeah, Count 1, the RICO conspiracy, drove the sentence in this case. We're going to talk about RICO in just a second, but I think the absence of the Sears jury instruction was there and it was preserved, and I think that had an effect on Count 1 as well. Can I ask you a quick question about the enhancement for credible threats? Was it for credible threats? Was that it, or was it because he did more than that? And the credible threats, do they have to be directed at some person, or is it three people in a room have a conversation and there's a private, I'm going to do something to X if he does Y, and X never hears it? I think the threats need to have some bit of a definitive basis, I think. Just a general statement, you know, we need to protect a coroner or something. Just generally, I don't know if that rises to the level of being a sufficiently definitive, credible threat to tie it to something that happens later on, which is why that was not applied by U.S. Probation in this case, because there's nothing to tie the incident a couple weeks later with this general statement by Mr. White. Well, that goes to a separate issue of whether something happened afterwards, but does a credible threat have to be directed at someone? In other words, if someone threatens me to my face, it has an effect on me. It scares me. I worry about it. I live in fear. But if I never heard the threat, it's like a tree falling in the forest. I'm just trying to get to what this upward adjustment means for making threats. I think it needs to be directed to a person, a group. There needs to be some sort of definitive link between the threat and the person who's being threatened. Okay. Any further questions as to Mr. White? Good morning, Your Honors. May it please the Court, I'm David Kallianathos, and I represent Jermaine Hardiman. I was trial counsel. Your Honors, there's two points I'd like to highlight that were raised in our brief, one relating to the association in fact argument and whether or not the evidence supported the finding of an association in fact, and then one particular point related to Mr. Hardiman on the drug quantity finding by the jury. Your Honors, the issue really is how do we interpret Boyle's articulation of an association in fact in a RICO conspiracy situation where we have a loose group that comes together for a common purpose. That common purpose cannot be the pattern of racketeering itself. It has to be something distinct. The evidence at trial, and the government does a very good job in their brief identifying all the evidence that did come out in the trial, all focuses on the acts of racketeering as the common purpose. They don't show any evidence because none was presented to the jury to identify some common purpose beyond the pattern of racketeering. And if Boyle is to have any meaning at all, there has to be that distinction. Can't you infer it from all of the acts that were committed by this group? Well, it seems that the indictment articulates how the PBP enterprise is separate from their pattern of racketeering in that the indictment describes the PBP as an enterprise comprised of mostly African American men from the Pueblo Bishop housing projects in Los Angeles who identified themselves with gang colors, tattoos, graffiti, gang signs, and apparel, and which has a hierarchy with YGs subordinate to OGs. The enterprise allegations are distinct from the pattern of alleged racketeering, which includes specific allegations of drug trafficking, gun trafficking, armed robbery, extortion, and murder. Well, and the answer is yes. You can, under the appropriate case, infer from the pattern of racketeering the association, in fact, that common purpose. However, merely articulating the identity of the group is not enough. That is what I'm suggesting. Well, do they have to file a charter? No, they don't, because again, Boyle is very specific, isn't it? It says that the formal business structure is not necessary for a criminal RICO association, in fact. Now, it's helpful because it provides more evidence of that structure, which then has the common purpose. But when we look at the evidence specifically in this case, what is the alleged common purpose? Well, we want to protect our territory so we can traffic in drugs. We want to protect our territory by going after rivals. Why? Those are patterns of racketeering acts, murder, drug trafficking. Who is the our in our territory? Well, and that's another interesting question based on the evidence. It's not necessarily the entire PBB, because as the evidence came in, each subset had its own kind of even greater structure than the overall structure. You had your cliques here that were running their own little organizations and doing their own pattern of racketeering, if you will. The conspiracy, the overarching PBB conspiracy is not what was proven. At most, what was proven here were individual cliques. And as to Mr. Hardiman, as to Mr. Hardiman specifically, the evidence showed that he was doing things on his own. He was not engaging in even the association. Did he commit acts with other people? Yes. But was it enough to show the common purpose? No. And again, if Boyle is going to have any meaning, that common purpose must be distinct. There has to be, even though the inference may be drawn, there has to be the distinct common purpose, and that was not shown here. Well, if the inference can be drawn, what's the problem? What is it being drawn from? Under your view, I would say it's being drawn from the commission of the various acts and furtherance. And so if you can draw the inference, why wasn't the jury committed to draw that inference? And I think the inference would have to answer one additional question. What is the common purpose? Well, it's to commit these crimes. And that's not enough. That's what I'm saying. That phrase you can infer from the pattern, the association, I think still requires that additional provision of what is that common purpose beyond the pattern. That's what I'm saying. Well, does Boyle require – I know after they do this, there's about – the indictment has about ten paragraphs describing the structure of the PVP, the location of it, da-da-da-da-da-da-da-da. Where do we find in Boyle that it – Boyle does say that the enterprise is separate from the racketeering, but where does it say that the indictment must describe the distinction in the kind of detail that you're talking about? I don't think Boyle says that the indictment has to describe it. I think that Boyle talks about the proof at trial, and that's what I'm focusing on here is what was the evidence and how do you draw that inference to that common purpose separate from. I don't think Boyle does at all create a requirement that it has to be specified in the indictment. And if I may briefly just on the point on the drug quantity. Again, the evidence focused, and again the government points out, the amount of drug trafficking that Mr. Hardiman was involved in, if you look at the citations in the record, it's very clear. The quantities they're talking about are powder cocaine, not cocaine-based, not crack cocaine. The crack cocaine testimony is very innocuous. Oh, a few times a day maybe, I don't know. I saw him do it maybe 10 times a week. Well, what's the quantity? The only quantity that the jury found was over 28 grams. The only quantity evidence at trial was the 43 or 48 grams from the June 4th transaction with Steven Patterson. And that was powder cocaine that became cocaine-based over four years. And the testimony of the forensic chemist explained why that happened. So again, the evidence did not support the finding of over 28 grams because there was nothing other than that specific evidence. Wasn't there a witness that said during 2007 to 2010 he witnessed Hardiman selling crack cocaine four to five times a day? He said it on one day. He saw maybe four to five times. I don't know, I think is the quote. There's another witness, CW15, who I believe testified that he saw or knew that Mr. Hardiman transacted maybe 10 to 20 times per week. But he doesn't have a quantity. That could be one gram. That could be half a gram. A usable quantity of crack is very, very small. In fact, it's a third of a gram. There is, if you count the, there is, as I understand the argument, the testimony of the chemist was that over time the cocaine, the powder cocaine may turn into cocaine-based. Yes. But we're not talking about over time. We're talking about at the time that the actual transaction occurred. Correct. So why can't, I don't understand what the chemist's testimony adds to it, that later on maybe when they tested it. What I'm saying is that the original chemist who tested it at the time of seizure, it was powder cocaine with a trace of sodium bicarbonate in it. Over four years there was this quantity presented to the jury of over 40 grams that was, had turned into cocaine-based. That's what I'm saying is they're hooked. That was the only amount. Your Honors, I'm out of time, and I don't want to take any more time from co-counsel unless the Court has other questions. Very well. Thank you. So before you start, how much time did you anticipate speaking? Maybe two minutes, Your Honor. All right. Let's put two minutes on the clock. They both take all your time. There we go. Well, I, you know. First state your. Ludlow Creary, Your Honor, and I'm Counsel for Anthony Gavarelle, and I was trial counsel. And, well, basically my colleague stated the arguments that would apply in the case of my client as well. In regards to establishing the enterprise. Yes, and I just want to briefly focus on some of the facts in my client's case. The Count II conspiracy to commit murder and furtherance of the enterprise isn't established because essentially that was a very spontaneous situation. It was a small group of young men. If there was a conspiracy that my client was involved in, it was a conspiracy amongst this small group of men. There was no meeting. There was no orders given. There was no involvement of any of the OGs. At least the government didn't present evidence that there was any larger conspiracy. Well, wasn't there, there had been a shooting of one of their people, and so wasn't the word is like we've got to retaliate here against a Hispanic, and then some poor guy with his two-year-old child gets shot? Well, that, in fact, did happen. And it was after that meeting, right? And after the shooting of a PBB. Well, there's no, the government didn't establish that my client was present at that particular meeting or that he was given any specific orders to do anything. It was a visceral, emotional response based on the evidence that was presented by the people of an act that was the result of someone coming into the place where these people live, someone that was a good friend of these young men. But the actual individuals who did conspire and did go out and commit this act, as the court knows, my client was actually acquitted of the murder itself. Did they find the gun at his house, the murder weapon? They found, my recollection is that they found the weapon at a house that- He was staying in. Well, the people had alleged that he was staying in, and there was some evidence that he had a connection to that house and that he was staying there. But was it his home? I said the people, I meant the government. The government didn't establish that that was actually his home. Did your client make a statement to the police? He made a number of statements to the police. Did he make a statement about the death of the man that was with his child? I believe he did, but in both the state court trial and in the federal trial, that statement was apparently rejected by the jury. But what did they hear? That he was there and he was involved. Okay, so could that be a basis for why he gets pulled into the conspiracy, but why he doesn't get convicted of the murder?  and you're actually present as an aider and abetter, yet you're not part of the murder. If you're there, if you're in the conspiracy, if you're present, and you do nothing to stop the killing, the murder, then you are actually a murderer. So the fact that he was found acquitted of the murder- Well, it still doesn't negate the evidence that they had, and we don't know exactly what they did with the evidence. You're really dealing with a sufficiency issue, so I'm trying to get my arms around what evidence they had, and the verdict is entitled to all inferences in its favor. And so some of that does have a negative reflection on your client. Yes, it does. I would submit to the court that there was not sufficient evidence that this was a conspiracy, even if he was involved in a conspiracy. This was not a conspiracy on a broader scale that was part of this racketeering enterprise that the government presented. Okay, I understand your argument. Thank you. Any further questions? Thank you for your argument. Thank you. We'll hear from the government. Your Honors, may it please the Court, Christopher Pelham for the Appellee United States, I was trial counsel as well, and with me in court today is my co-trial counsel, AUSA Mack Jenkins. Your Honors, I'll work in order, and I'll start by addressing first Judge Otero's comments during the course of voir dire in the case. It's, of course, the government's position that the court did not instruct the jury that it could refer to its biases or prejudices during the course of its deliberation of the evidence. It's also our position that the court did properly instruct the jury both during the course of voir dire and when charging the jury before closing arguments and even after closing arguments that there was a presumption of innocence, that the presumption could only be rebutted by the production of evidence beyond a reasonable doubt, and that the jury was confined to the consideration of evidence that had been presented at trial. And, in fact, that's what makes this case distinct from Dilg. In Dilg, the Eleventh Circuit found that there wasn't an explicit instruction to the jury that they were confined to the evidence in the record. This court did, in fact, confine the jury to the record and explicitly told them that they could not refer to their biases or prejudices before they began deliberation. Well, they weren't convicted of everything either, right? That's right. So we can construe from that that the jury did understand its duty to weigh the government against the high court. Can you talk about the Sears instruction? Yes. It's not plain error because there were objections posed. They did request the instruction. Yes. So are we dealing with abuse of discretion? We are as to the findings of fact to support the district court's decision to reject the instruction, de novo as to whether or not the proposed instruction correctly stated the law. And here, Your Honors, we do firmly assert that the district court did not abuse its discretion in finding that there was no way, there was not enough evidence for the jury to find that the only parties with whom Defendant White had conspired in this case were the two, or excuse me, was the one informant to whom Defendant White had sold drugs. Well, it does sort of seem, though, that they saw that video. And, you know, it was pretty hard for them to, you know, I mean that's pretty hard for them to ignore. And I'm assuming because you have the video, you also had the drug quantity. And there does seem to be a finding later that's consistent with the amount that was retrieved from that. You know, so there seems to be some sort of connection there. Our position, Your Honor, is that that's speculation as to what happened in that jury room. But it's not really wild speculation, given the verdict. Understood. What we have is a bifurcated inquiry, though. Did the defendant conspire with others to sell drugs under Count 5? And then was there, within the jointly undertaken scope of his activity, enough evidence beyond a reasonable doubt to attribute to him the higher quantities on that drug? That's not the test, though, whether there's enough. The jury didn't find anything more than 50 grams. It found less than 50 grams. And there were two transactions which the defendant's lawyer conceded actually took place. And even on your chart, I mean it seems to me you may have confused the jury because I think you had a chart which indicated how much was seized from whom, and they may have simply relied on that chart. But why isn't—and we've held it. It's a generous test in favor of the defendant. Why shouldn't he have gotten this charge? So the question is not whether or not there was evidence to support a finding that the defendant sold drugs to an informant. No one disputed that. Right. The question is whether or not that's all he ever dealt with. And in this particular case— Maybe the jury could have found more, but it seems to me that he— I don't see why he wasn't entitled to the instruction of why you would even— I don't know whether you were the trial attorney, but why the government would even object. I'll point to in particular three pieces of evidence, Your Honor. So the first is Exhibit 52. Okay, just so that we understand. If he's entitled to that instruction, then it's not subject to harmless error? If he was entitled to that instruction, no, the court would not analyze whether or not the absence of the instruction was harmless. It would be per se. Okay, so you can't—so you have to show he wasn't entitled to it, and then that has to be that it wasn't the only theory of why he was found guilty, right? Yes. But then I think Judge Thomas has pointed out that it does seem to have— it's not as wild as sometimes. So what is the strength of the evidence otherwise? This case is not a case, and as we believe Judge Otero probably found, this wasn't a case in which the jury could have looked at the evidence and said the only drug activity conducted by Defendant White in the course of a conspiracy were these two transactions. First of all, there was a lot of drug activity, and some of your list of acts that were committed in furtherance of the conspiracy deals, I think, with marijuana and possibly cocaine, but this was a heroin conspiracy that you were talking about. And it seems to me that he was entitled to this charge. Well, the conspiracy charged the distribution— well, Count Five charged the conspiracy to distribute controlled substances generally, and then there are findings that it's specific drugs. But in this case, Defendant did not contest that he was a member of the gang. He appeared in that surreptitiously recorded August 2009 gang video, and he addresses in a body of gathered gang members what it is that the gang has to do to protect this territory monopoly over those drug transactions. He makes virulent comments towards interlopers who are caught selling drugs within the gang's territory. There is extensive evidence, including through the defense's own witnesses, that this territory monopoly was protected by force of— Aren't you making a disguised harmless error argument that you just conceded was not applicable here? It seems to me yours is this is just a harmless error under another label. I urge that it is not, and that's because the question is whether or not the judge, the district judge, looking at the evidence as presented, abused his discretion in finding that there wasn't a foundation for the jury to support the instruction. It can't be that in every case in which there's a substantive interaction with an informant, the seer's instruction is required upon request by a defendant. No, but the argument here is that that was his theory. That was his defense to count five is that the only interaction we have is with a government informant, and you can't count that as conspiracy. So it's more than just an instruction that was denied. It's denying his theory of a defense on to count five. So it was a fairly serious act on the part of the district court. So you have to say there's no evidentiary support for that. That's right. And there was evidentiary support in the sense that there were separate transactions that only involved the C.I. and Mr. White. We urge, Your Honor, that it goes beyond that. It's not simply that there was affirmative evidence of an interaction with the C.I. The question is whether or not a jury could find that that was all that there was. Well, but the difference is that if it's his theory of the case, you can argue just what you've been arguing, that there's a whole lot of other evidence there, and then the jury decides. But if you take away his theory and he concedes the transactions, you pretty much concede count five, don't you? I don't know. I don't believe so, Your Honor. And more must be required than simply that the defendant proposes a theory for his defense. There has to be a foundational support for that instruction. Otherwise, instruction is misleading or confusing. And certainly the test in our circuit has not been. Why would it have been confusing? You had the C.I.s. You had other people. Your theory was he was conspiring with people other than the C.I.s. What's confusing about the instruction? Because what the instruction supposes is that that's what the defendant is charged with, is simply these interactions with the C.I.s. And it wasn't. As charged, the conspiracy was this drug company. But as charged, he was saying as charged, the only thing that we concede that he did these two drug transactions with the C.I. and that was the extent of his responsibility. Well, and again, we urge, Your Honor, that it was inconsistent with the evidence. What really makes this case stand out factually is when it's compared to Escobar-DeBite or to Sears itself. In both of those cases, it was clear that the factual record lent itself strongly to an inference that the only people that the government had records of the defendants interacting with were the government's own agents. So Escobar-DeBite, the defendant testified, her husband testified, and she said, look, the only reason I did this is because I was pressured by an informant. Yeah, but that's not the limit of the Sears instruction. Even when there are other co-conspirators, I mean, I always give this charge. I don't even think about it. I say you can't be convicted of conspiring. If the only person he conspired with is a government agent, then he can't be convicted. What's the big deal about that? I don't see why it's confusing. I'm not suggesting, Your Honor, that Escobar-DeBite is the outward limit of the instruction, but that case is very different than the one here where the jury hears six weeks of evidence about how the gang members work together, how the gang as a unit controls drug trafficking, and how Defendant White, by his own statements and by his appearances and recorded evidence, took part in that overall complex. And in fact, while there were two transactions in which the government did seize drugs directly from Defendant White, there was a transaction from which no drugs were seized, but a recorded transaction. It was April 16, 2009. It's referred to in an excerpt of record of 1372 in which an informant goes to Defendant White, asks for a certain amount of drugs, and Defendant White walks the informant over to another gang member where the transaction is then consummated. So, yes, while the two transactions for which drugs were seized directly from Defendant White are referenced in the brief, there's at least one transaction in which Defendant interacts with a CI and refers another gang member to a drug deal. So what is the effect if we think that the Sears instruction should have been given? How does that affect the overall verdict? We don't believe, Your Honor, that it applies to count one. As briefed, the parties have focused on its effect on count five. Count one has elements that are separate from simply a conspiracy to commit a drug transaction. Count one requires the jury to find that the defendant participated and agreed with others to participate in a pattern of racketeering activity in an enterprise. We don't believe that the Sears instruction applies to count one, especially because count one contemplates more forms of racketeering activity than simply distribution of controlled substances. And I'm sorry, Judge Portman. I wanted to ask you about credible threat. Was the enhancement based on the threat? It was based on an instruction by the defendant to commit a direction to violence, and in particular what Judge Otero focused on were the comments by Defendant in Exhibit 52 in which the defendant said, look, we need to lock down this neighborhood. There needs to be a gun on every corner. Don't let, well, he uses more colorful language, but he says don't let interlopers into the projects and then out without getting encountered by one of us. Okay, so that's the basis for the credible threat. Anything else? Not on credible threat, Your Honor. Okay. I'll just very briefly. Much of an association in fact argument. Very briefly, Your Honor. We do not believe that as pled or as proven the racketeering enterprise in this case was restricted simply to the performance of specific racketeering acts, protecting the neighborhood, posturing against rival gang members, getting remunerative opportunities not just from drug trafficking but also robbery, theft. These are criminal acts that are not set forth as specific racketeering predicates under the statute, and they're criminal objects that the government alleged and proved that the Pueblo bishops were involved in and that showed that the gang had a life beyond simply the discrete transactions that made up those predicates. And it's for that reason that the court can find under what is a very broad and liberally construed test in Boyle and in Odom and Turquette a group of individuals who are associated together for a common purpose under some form of longevity. So we believe that the defendants are imposing requirements that are simply not present in the proof of an association. So how much structure does a gang have to have before it meets Boyle's requirement? The gang has to have, there have to be relationships among the gang members and there has to be some common purpose beyond the discrete commission of what could be racketeering acts in a pattern. So it's hard for me to think within the terms of this gang what that would look like. But certainly this gang met that standard. This is an intergenerational gang. Well is it OGs, YGs? How does that figure in? It had a structure. And then I guess you can be sort of in a supervising YG as opposed to just a YG. Right. I mean, don't we have an OG, sort of a supervising YG and a YG? Yes. YG Generals was the term induced at trial. And that's a big part of it. The fact that the gang had a very distinct geographical identity. It was really localized to these housing projects. It had real animus with rival gang members. I mean, the government proposed this proof of the existence of this enterprise, the fact that these gang members were committing very heinous acts against folks that they interpreted to be rival gang members. It's hard to believe that these young men would do that unless they felt some sort of identity that compelled them to commit these murders or attempted murders. What about the crack cocaine amount asked to Mr. Hardiman? So what we've always urged at the district court level and here, Your Honor, is that Defendant Hardiman is not giving sufficient credit to the cooperator testimony in this case, among other portions of evidence. Yes, the actual drugs seized from him do not meet the base offense level that the district court calculated, but numerous cooperating witnesses, as briefed in our brief, indicated that they sold Defendant powder cocaine, they saw him on various occasions converted to crack cocaine, and then they saw him sell crack cocaine in very high quantities throughout the projects. That's certainly sufficient for the jury to make the quantity finding that they did above 28 grams and very much supportive of the district court's finding, which is by preponderance, and it must rely on reliable evidence, that the defendant in fact trafficked more than the jury found. So just looking at a theory of direct liability, even before we get to vicarious liability, a theory of direct liability as supported by the cooperator's testimony, we get certainly a sufficient basis for the district court's finding. Unless there are other questions, Your Honors, I will yield. I wanted to go back to the first argument, just to make sure we covered that, and that is the question of the suspicious. You were trial, because you're a trial counsel, maybe you can clear this up for me. What was the context of that? Was that just an offhand remark by Judge Otero? No, I believe that... Is this something from which he read? Well, excuse me, yes. It was just a remark by Judge Otero. I don't believe he was reading from anything. I think that what had happened was that during the course of a jury, a perspective juror had indicated that he had suspicions about the case or made remarks about how fair he could be if chosen as a juror. And you see from the record itself that Judge Otero says, look, I want to go back to what this perspective juror said. You may have these suspicions. You may have a reason to believe that these defendants are guilty of something, but keep in mind the government must meet its burden. Did they look like they were in custody? Were they wearing street clothes? They were wearing court clothes, so I think they all had button-up shirts. Okay, and did they come in and out of doors that looked like they were in custody? Not in the presence of the panel. They just sat there? Yeah. But did they kind of—you said they were wearing court clothes. Did they all look like—like you guys don't all look exactly alike here. You look like you—I don't think you came in from a custody door. I think—I mean, they looked—they didn't necessarily look like counsel because I don't think they were wearing jackets, but they were wearing normal street clothes, casual clothes, or church clothes, I should say. Well, so your response basically is that it was a response to something that had been said rather than— because standing alone, it's pretty odd for a district court to say, you may be suspicious regarding the defendants. I mean, that would not be part of a script I think that anyone would want to use. It was responsive, I believe, to a comment that a prospective juror had made or a number of prospective jurors, and this is something that Judge Otero reiterated multiple times during voir dire, that there was a burden of proof. The defendants were, he said, couched, but he meant cloaked in the presumption of innocence. And, of course, he repeated all that after the evidence. Okay. Any further questions? Thank you. Thank you, Your Honor. We'll give you some time for rebuttal if you would like some. We'll put up two minutes. Thank you, Your Honor. Briefly, Your Honor's asked the question, what would the effect be if count five were to be overturned, particularly for Mr. White, but even as it applied to Mr. Hardiman as well, there was that question in the evidence, who was Mr. White or Mr. Hardiman conspiring with in the various undercover videos. The government's theory as presented to the jury on count one, on Rico, was primarily that the racketeering act, the pattern of racketeering here, was drug trafficking. Yes, there was this protect the territory from rival gangs. Why? The evidence that came in was so we could control our drug trafficking. We didn't want people moving in on our territory for drug trafficking. If it was primarily, how did the murder factor in? Did they hear evidence on that? There was evidence on the shooting, on the attack on one of the residents. They obviously heard the evidence as to Mr. Gaborel, the later alleged retaliatory attack, which they believed was the rival gang, which that's how it was presented as what was going on in the situation. That's pretty significant. It is, and I'm not saying that the only racketeering activity was drug trafficking, but it was the primary, so the question then becomes, if there is this undermining of count five of the drug trafficking conspiracy, was there any drug trafficking conspiracy by Mr. White, Mr. Hardiman, what is that going to do to the jury's consideration of the government's theory of the pattern of racketeering under count one? I think it undermines that. I think at minimum you are looking at returning the case even on count one for a retrial because of the quantum of evidence under count one. The pattern of racketeering was drug trafficking. That sort of came up over at counsel table after hearing the other side because Mr. White's counsel said, hey, it affects count five. Yes, it did. It was something that we started thinking about. Well, what is the true effect over all? He didn't concede count one. Yes, he did not concede count one. But count five was the fact that the jury found, with respect to Mr. White, less than 28 grams doesn't mean there wasn't a conspiracy. It was just the amount was necessary ultimately, I assume, for sentencing purposes. But if they had the Sears charge, if they knew that, oh, wait a minute, he can't conspire with the CI, then what does that do to his participation in any conspiracy whatsoever? How does that apply to Mr. Hardiman? How does that undermine or affect count one overall? The point being, I think that because the government's theory was so predominantly a pattern of racketeering activity involving drug trafficking that if you have this problem with count five, it does translate over to count one, unless the court has any other questions. Thank you, Counselor. Thank you very much. Thank you all for your arguments today. The cases heard will be submitted. We appreciate your briefs and your arguments, and we'll be in recess. All right.
judges: Korman, Thomas, Callahan